Good morning, Your Honors, and thank you for having us here today to hear this case. We're here before you on the grant of a motion for summary judgment in favor of the City of Phoenix and against my client, Richard Sudberry, who brought a wrongful death claim against the City and a Title 42, Section 1983 case against the State of Arizona. The case against the State has since been settled, but not until after this motion for summary judgment was granted in favor of the City of Phoenix. The issues that are before this Court are strictly State law issues against the City. There are no Federal question claims. Judge Wake's ruling, in our opinion, flew away from established State law in Arizona as to the standard and when summary judgment is appropriate. There is a gross negligence standard that applies to the State on wrongful death claims or for any claim failure to make arrest, and to the City of Phoenix, to government actors. We agree with that. It creates a heightened burden upon the plaintiff to establish not simple negligence but gross negligence. Gross negligence is defined by our statutes and by our case authority in the Walls case as the creation of an unreasonable risk of harm to another, together with a high degree of probability that harm will result. Judge Wake. Well, State supreme court seems to define it even more severely than that. Go back to the Scott decision. It speaks of lawless and destructive spirit. And that, frankly, I think that becomes a very high standard. They use the terms, but they also say that only in the most extreme of cases is this a decision to be made by the court as a matter of law. That typically, if there is any evidence from which a reasonable jury could infer that there was gross negligence, this case should go to the jury. Well, what you just spoke of is really the summary judgment standard. Are we governed by Arizona's – does Arizona have a different summary judgment standard? I mean, any evidence isn't the standard for summary judgment. It's evidence sufficient for a reasonable jury to so conclude. And if you've got a very high standard, then the existence of any evidence will not, at least in Federal courts, survive summary judgment. Are you arguing that a different standard applies here for this case? I'm arguing, Your Honor, that in – according to Arizona law, summary judgment should only be granted in rare occasions. Right. But I think really the Federal summary judgment standard applies. But I think at the end of the day that there may not be a meaningful difference between the two. And I'll agree with you for the purposes. You know, it's a horrible, horrible underlying case. There's no doubt about that with the facts. But what are – what, in your view, are the facts that would satisfy, create a genuine issue of fact that there was gross negligence if you had to summarize those two or three facts? Sure. First and foremost, Your Honor, is the fact that the City of Phoenix had actual knowledge of a imminent and perhaps the most significant harm you could possibly have. By the admission of their own police officer, Officer Heinrich, he believed that the perpetrator in this case was – not only had the intent and the ability to kill Caitlin Sudbury, but was committed to doing it. He believed he wanted to harm her and knew it. As you look at the facts of this case, they're spelled out individually by the Court and by the City of Phoenix in this. But when you look at the overall picture, after that determination by Officer Heinrich was made, the only thing that happened from the City of Phoenix is they went out to the known residence, knocked on the door, nobody answered, and they left. From that point, there was an actual knowledge of the city of this harm. Nothing happened to mitigate that danger. There was never a discussion with Daniel Byrd, a discussion with his mother, any evidence that his access to weapons, which Officer Heinrich also knew he had, had been alleviated in some way. There was no mitigation of the danger whatsoever, and yet the police department did nothing else. They turned around. It was supposed to go to a detective for follow-up. There is some dispute as to whether anyone was assigned, but I do not believe at this stage there is any dispute that nothing in the record indicates anything was ever done. They just went away. More importantly, Your Honor. Well, the record doesn't indicate that they deliberately turned their back on this problem. The record indicates this case fell through the cracks. And isn't that simple negligence? The file got lost, in effect. It's not simple negligence when there is such an unreasonable risk. When you have someone who you believe is going to kill someone else, and as an employer or a provider of police protection. We don't know who caused the file to be lost. For example, the unit that sent it on to the detective, I think, how is it to know that it never got there or the detective didn't, for whatever reason, didn't realize the problem? Well, Your Honor, I believe this was brought up in the... I'm trying to find where the, quote, negligence is and then determine the degree. As a whole, the Department has an obligation, particularly in an incident where you have a death threat. This case is very analogous to the Hutcherson case. You're saying basically we sort of impute the knowledge of the first unit to the unit to which it was referred. Correct. It's one entity. The City of Phoenix Police Department, you don't sue each individual officer or clerk or whoever else. It is an entity. The knowledge is imputed amongst it. It has a set of regulations internally and has adopted the national CALEA standards for how it responds to certain classes of dangers and threats. Murder is perhaps the greatest threat it can possibly encounter and is entitled to certain steps that the police officers are supposed to take pursuant to their own standards to try to prevent this. It's acknowledged in this case they didn't take any of those steps. And that's what the district court presumed. But then the district court said, went on to say that the department did not take any actions that increased the risk. And I respectfully disagree, Your Honor. I believe... And in particular, the district court said there's no evidence that the family relied on on the police department's actions. But there is. They sent her back to school. They did everything the police asked them to do. Well, the police asked her. They suggested that they keep her home from school, right? And they did. The threat happened on a Thursday. Right. Police protection was provided at the school Thursday and Friday. Now, I would pose to this Court that the police protection was provided to the school not for the protection of Caitlin Sudbury, who was home that day, but in order to prevent a Columbine-like shooting at the school of Daniel Byrd being there. They had a uniformed officer out front to deter him from the school, not to try to capture or apprehend him. Nevertheless, she stayed home Thursday and Friday. The record's clear on that. She stayed home through the weekend. It wasn't until Monday that she returned to school and on her way home was shot and killed. During the entire intervening period of time, the city of Phoenix, having undertaken and told the family that we're going to find, catch, arrest, and detain this young man, never came back and said, hey, by the way, I know it's been four days, guys, but we really haven't been looking for him and he's still out there running loose. The police department... And it sounds like they stopped posting an officer at the school as well. That's correct. The school... Does that suggest that they made an assessment that this threat had dissipated or the passage of time has relieved the urgency behind the threat? That's certainly the appearance to the family and to onlookers from outside. But, again, there is no facts to indicate at this point. In fact, some of the facts that were not before the Court that have been discovered after this grant of summary judgment is that it was far from the case. The only guidance this young man had in his life was out of town on the day he came and shot her. He had left the night before. That was a Big Brother program. He was still... None of that's in the record. None of it's in the record. The point is, from an outward appearance... Get that far, you can raise that. From an outward appearance, the actions of the police, whether it be intentional or not, as they came in and identified this threat and said, we're going to catch this young man, you guys go get your order of protection, which they did. Keep her home from school, which they did. And then by Monday, police are gone. Nobody's come to them and said anything otherwise. The family's guard is let down. They say it must be okay, the police must be on top of this. They send her to school. And yet that danger had not mitigated in the slightest. It continued. And certainly the order of protection really didn't enhance the – it had no effect. In order of... It could have no effect. If a young man is going to murder somebody, I have a feeling an order of protection is not going to play into their mindset. It was something there to comfort the family, but certainly wasn't going to prevent this loss. And perhaps give it a false sense of protection. Absolutely. Now, it was never served. They didn't have a chance to get it served. But they did have it issued and had it out for service. I will say, Your Honors, that as I look at this case, and particularly I do want to save a little time, but I'll spend another minute talking about this. The proximate cause issue determined by Judge Wake is also very concerning. And what he claims is because we could not say that any additional efforts by the police would have stopped this crime... The standard should be more likely than not, right? A 17-year-old kid with basically nobody else at home, where is he going to go? They should have at least kept going back and checking. Had the police have done, followed their own procedures, we wouldn't be here in this court. We would not have... Or at least a question for the jury to determine whether or not, more likely than not, he would have been arrested. That's correct. And it becomes a matter of probabilities when you talk about any failure-to-act case. The ruling that in this case it's just speculated to say what would happen. Every failure-to-act case requires some speculation. Because what you are saying is, had they have done something that didn't happen, the result would have been different. You base that upon probabilities. And that speculation is probably the province of the jury in light of whatever evidence is presented, right? That is correct. It's a jury question. I think we have your argument at hand for opening. Why don't you save some time for rebuttal? Thank you, Your Honor. May it please the Court and counsel, my name is Michelle Iafrate, and I represent the City of Phoenix. And I'm here today because I believe that in this case, the State of Arizona is no longer in this case. Yes. Your Honor, I agree with you, and the Court of Appeals even wrote it, or excuse me, the District Court wrote it in his order, that even the depth of tragedy in this case cannot override the rule of Arizona law. We're here today because ARS 12820.02 applies in this case. Unless the City of Phoenix Police Department intentionally intended to hurt Caitlin Sudbury, which they did not, or they were grossly negligent, which they were not. I don't know how to define a lawless and destructive spirit. Do you? I do not have an exact definition for you, but it seems quite a high bar, Your Honor. In my brief, I did explain all of the different techniques that the City of Phoenix went through in order to try to protect Caitlin Sudbury. This case is not like Hutcherson, which appellant wants you to believe. They did not tell the parents to stop protecting their child. Caitlin Sudbury stayed home one day from school. City of Phoenix did not say, we had arrested Daniel Byrd, you're free to go back to school. City of Phoenix stayed at the school for two days, barricading the school, protecting the school, but were told by the school, and this is in the record, the school said, we don't want you protecting the school anymore. It's scaring the students and the parents. We want you to subdue your barricade. They did go to Daniel Byrd's house on several occasions. They attempted to at least check welfare, could not get a hold of him. They also went out and tried to arrest him. They actually filed a police report from a previous assault in order to get probable cause to go arrest him. The City of Phoenix did not have the perpetrator at hand in front of them, able to arrest them like in Walls and other cases that are in the briefs. They were looking for Daniel Byrd. They couldn't find him, and they were doing their best to get him. But how do we know that they were looking after the last time they went to his house? There is nothing in the record, Your Honor, that shows that they were continuously looking for him after the 24th. That is correct. However, this case was not dead. There were multiple cases out there that the police department was handling. And so what one of Your Honors was mentioning was if it fell through the cracks, is that negligence? Unfortunately, yes, it is. Is it considered lawless and destructive spirit? Of course not. Just to interrupt for a second. We start with the premise the district court did, you would agree, that for the purpose of the summary judgment decision, the Phoenix Police Department made no further efforts to locate and apprehend Byrd after January 23rd. True? I believe it was 24th. Well, it says 23rd in the opinion. Then I would concede that, Your Honor. So that's where we start. That is where we start. And that's where we started in the motion for summary judgment as well. We did concede that point. It was assigned to an assistant, but it had not been up and running regarding tracking down Daniel Byrd following the 23rd. So why isn't it a question of fact for the jury as to the fact that they stopped looking for him as of the 23rd? I realize that if you went to trial, you would dispute that. I understand that. Understood. Understood. Why isn't that a question of fact? For this argument, Your Honor, it's not a question of fact. I concede that fact, that they, for this argument. Hold on. I'm sorry. Why isn't it a question of fact for the jury to determine whether or not the fact that they stopped looking for him is a question for the jury to resolve whether that's gross negligence? Understood. I misunderstood you previously, sir. I wasn't clear on my question, so. Your Honor, the case law indicates in Badia and McLeaf that if all that you have is speculative testimony, and that's what we have here, is speculative testimony from a hired expert, that doing something further could have found Daniel Byrd, got him into custody, kept him in custody, and prevented him from following his threat of killing Caitlin Sudbury. Well, it's not the only causation link. I mean, if you tell the family that he's still loose and she doesn't return to school, then you don't have the murder either. Potentially. Well, that makes that a case for proximate causation, doesn't it? I don't think you need to get to proximate cause in this case, Your Honor. I think the argument you just gave us was a proximate cause case. Let's go back to the question of whether it's gross negligence. I mean, why isn't it for the jury to decide whether this was gross negligence? If you have, and for myself, I see a little ambiguity in the way that the Arizona courts have discussed the standard. If I look to the Wells case, if the key factor is the high probability that substantial harm will result, well, isn't that a jury kind of question? And is it so unreasonable to think that a jury might come back and answer that question, yes, based on these facts? I do not believe that the jury would come back. Okay. So tell me, I mean, you're defending a summary judgment. Why is it that a reasonable jury couldn't come back and answer yes to the question, was this gross negligence, if the standard is the standard articulated in the Wells case? Are you talking about Walls or Wells, Your Honor, just so that I'm on the same page with you? Well, from my own writing, it's a W and it's got two L's and an S. So it's the Arizona Court of Appeals case from 1991. Okay. So that's Walls. Okay. At least that's what I call it. Okay. And in that case, the officer was behind the suspect, watching the suspect, having the suspect in his vision, and he could have stopped the suspect at that point. That is not this case. This case is Bird was not to be found. Even though they stopped looking for this record, they stopped looking on the 23rd, Bird was not to be found. They couldn't just arrest the person. How do we know he was not to be found if our premise is they stopped looking? He might have been in his house most of the time. I don't know how you can assume he couldn't have been found. He's a 17-year-old kid. Where is he going to go? He's got no adult companions or associates so far as we know. Where is he going to go? He could go anywhere, Your Honor. Of course he could. I mean, he was street savvy. The jury could find that it was more likely than not that he would probably have been found at home had they kept on looking, had they a couple times a day. It wouldn't have taken much, perhaps. Your Honor, what I heard, your question was more likely than not probably. And I don't think that that's the standard. But had they, given these facts, a 17-year-old kid, presumably with no resources of any kind, what is the most likely place to try and find him if you are actively trying to protect this young woman? Not this kid, Your Honor. This kid did have resources. He had been living on his own for quite some time. That is in the record. How does that make the police activity any less negligent? I mean, are you arguing to us that police made a calculated judgment, we're not going to find this kid so we're not even going to try? No. Then why don't we have a case of negligence? There's a different argument for causation, but why isn't negligence to stop looking? Your Honor, I would even concede negligence. I am not conceding gross negligence. Then let's take it a step further. Why isn't it gross negligence? Why would it be not possible for a reasonable jury to come back and say, in light of the high probability that substantial harm will result, that this passes the test for gross negligence? Because the police officer's activities was not lawless in a destructive spirit pursuant to the Scott case. I mean, it sounds like what we're doing is we're all arguing regarding the squishy definitions that are suggested. That's why I started with plaintiff's counsel. I'm not sure under Arizona law what the standard is. So if you think that's an important difference, can you tell me why it is that we should adopt the lawless and destructive spirit or recognize that as the formula that Arizona law applies to this? Because that's the U.S. Supreme Court case that defines gross negligence. So I would submit that you would apply that definition to this case. On the question of proximate cause, I mean, couldn't the jury pretty readily conclude that there was a very substantial likelihood that had the police apprehended this man and brought him before the juvenile court, that court would have detained him under these circumstances? The evidence that we have in this record does not support that situation, Your Honor. In this case, in Sergeant Heinrich's deposition, he testified that he went to the probation officer in attempting to have Daniel Byrd's probation revoked. That would have been the quickest and easiest way to get him into custody, but that doesn't mean that he would stay there. No, because revoking probation simply would result in the issuance of a warrant. They still would have had to go out and find him. Correct. But my point is, once they got him, he would have been brought before a court. Correct. And isn't it highly likely, almost incontrovertible, that any judge looking at this kid and these circumstances and those threats would have detained him? Well, Your Honor, I don't have the case law in front of you, but from previous cases, I do know that there are cases regarding you cannot speculate as to what a judge would or would not do in a situation where a ruling has not been made or, in fact, a ruling has been made, and you go back and you second-guess what a judge did. So that testimony would not make it to the jury regarding what a judge would or would not do. If you have no further questions. I think we have the argument in hand. It's a very difficult case, and of course, we aren't dealing with our own case law. We're dealing with Arizona's, which is a little more difficult to read. Makes it extremely difficult. Thank you. Thank you, counsel. We'll hear rebuttal. Is she right that that evidence about had the young man been arrested and brought before court, what might have happened or what would have been likely to have happened under all these circumstances not made it to the jury? No. It would have made it to the jury, and it would have made it to the jury in a couple of different forms. Not necessarily in a judge would have done this. But this case gets even more interesting on its facts. We retained an expert with respect to the Child Protective Services and Juvenile Probation Department side of this case, a gentleman by the name of Lon Taubman. Lon has been practicing in the juvenile probation system for a long time as a guardian ad litem. We discovered after retaining Mr. Taubman that he was actually Daniel Byrd's guardian ad litem. Is this in the record? This is in the record. And Lon Taubman's affidavit is included in our excerpts of record. Lon Taubman stated without question, had he have known any of these facts, he was never told any of these facts. Had he have known any of the facts of this case, he would have demanded as the guardian ad litem that Daniel Byrd be detained both for his own protection and Caitlin's protection. I don't know how that evidence doesn't. Could you argue, in order to meet the gross negligence standard, that the conduct of the police department was shocking to the conscience? We don't know what they did or why they did it, but the fact that this happened without any further efforts whatsoever, apparently, to apprehend this young man or any explanation of why they didn't do what they didn't do, is simply shocking to the conscience. Astonishing. The fact that they did nothing other than the one knock on the door the one day, there were five officers. After Officer Heinrich, Sergeant Heinrich, made his determination that this was a credible threat and a real danger, there was one knock on the door. That's it. Nothing further. That's uncontested. It's in the facts. It's in Officer Heinrich's or Sergeant Heinrich's. And they barricaded the school, which suggests on some level they perceived a serious threat. Well, barricade is a strong word, Your Honor. They guard. They have somebody posted. They put a uniformed officer in front of the school. Right. Barricaded is overkill. And that's what really makes me scratch my head, because if they took it seriously enough to post somebody at the school, it's hard to understand the void that we have with regard to trying to track them down. Well, and, Your Honor, they sent five officers for the arrest because of the SWAT team. Is that right? I believe there were uniformed officers and another sergeant because Sergeant Heinrich anticipated that this kid was dangerous enough that there could be a shootout with police or a barricade-type situation that he wanted additional officers there. I want to address quickly in my last minute here this gross negligence, lawless and destructive spirit standard. Because we have an Arizona Supreme Court case in 1998, well after the qualified immunity statute was enacted, and that's Hutcherson v. City of Phoenix. City of Phoenix argues this is inapplicable because it's a 911 call case. But it was still subject to the same standards. And the facts are eerily similar to this. The city received notice of a threatened murder or a threat to kill somebody. It went in. They had that knowledge. And the 911 operator mischaracterized the call, misprioritized the call, put it as a Category 3 instead of an urgent call. So 22 minutes later, the offender shows up and kills everybody, including himself. The jury in that case found the City of Phoenix liable for 75 percent under a gross negligence standard. So did Hutcherson change the standard from lawless? Is that your contention? What I'm saying is, Your Honor, this lawless and destructive spirit, if it can be evidenced and supported by a misclassification of a 911 call, then we should certainly have the opportunity to argue to the jury in this case that it was also met by the fact that the police had this known, identified, acknowledged threat and did absolutely nothing to avert it before the killing took place. Thank you, counsel. And if I can say, falling through the cracks is similar conduct to miscategorizing the level of the call. That's my position. It was a negligent act on the part of the particular individual who did it. But it applied to the entire department and what, through her, the department in fact knew. That is correct. Thank you, Your Honor. Well, thank you both for the arguments and your briefing. It's an interesting and difficult case. And we appreciate your presentations. We'll be in recess for ten minutes. All rise.
judges: Carr, Thomas, Clifton